IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2024 Session

**STATE OF TENNESSEE v. TEVIN WAYNE GRIFFIN**

**Appeal from the Criminal Court for Davidson County**
**No. 2018-A-656     Cheryl A. Blackburn, Judge**

_____

**No. M2023-01376-CCA-R3-CD**

_____

Defendant, Tevin Wayne Griffin, was convicted by a Davidson County jury for the premeditated first degree murder of the victim and was sentenced to life imprisonment. Defendant appeals, arguing that the trial court abused its discretion in determining that during trial Defendant opened the door to previously excluded cell site location data and that the evidence was insufficient to establish that he acted with premeditation. Upon our review of the entire record, oral arguments and briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Manuel B. Russ (on appeal), and Mike Engle and Ryan Davis (at trial), Nashville, Tennessee, for the appellant, Tevin Griffin.

Jonathan Skrmetti, Attorney General and Reporter; Nicholas W. Spangler, Associate Solicitor General; Glenn R. Funk, District Attorney General; and Ronald Dowdy and Macy Pesavento, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arose from the February 12, 2017 shooting of the victim, David White, at the Andrew Jackson Apartments in North Nashville. On March 23, 2018, Defendant was indicted for first degree premeditated murder.

*Motions to Suppress*

Metropolitan Nashville Police Department ("MNPD") Detective Melody Saxon identified Defendant as a suspect in this case. On September 28, 2017, when Defendant was arrested for an unrelated shooting, he had three cell phones in his possession. MNPD Detective Williams Mathis obtained a search warrant for Defendant's cell phones in the unrelated case.[1]

Subsequently, on January 8, 2018, Detective Saxon applied for and obtained a court order in the present case for the production of Defendant's subscriber and call history, the cell site location data, text messages, and all physical cell phone locations for one of the three phones. Based on the decision in *Carpenter v. United States*,[2] Detective Saxon also obtained a search warrant for Defendant's cell phone records for one of the three phones, including the cell site location data, in November 2018.[3] Prior to trial, Defendant filed a motion to suppress the evidence obtained with the court order and from the search warrant. On May 24, 2019, the trial court entered an order granting Defendant's motion in part, finding that the cell site location data may not be obtained via court order after *Carpenter* and that the affidavit in support of the search warrant was not supported by probable cause because it did not establish a nexus between the cell phone and the shooting. The trial court found that other evidence contained in the phone records was properly obtained with the January 2018 court order.

On June 12, 2019, Detective Saxon obtained a second search warrant for Defendant's cell phone records, including the cell site location data, and she obtained a third search warrant on April 9, 2020. The affidavit in support of the June 12, 2019 search warrant stated that Defendant was in possession of a cell phone when he was arrested on unrelated charges in September 2017 and that "[d]uring that arrest, a phone was found on his person and seized pursuant to that arrest. A search warrant for the contents of that phone was done. The phone number associated with the phone is . . . . [Defendant] was in possession of that phone number at the time of [the victim's] homicide." The affidavit in support of the April 9, 2020 search warrant also contained information about the victim's

---

[1] While it is unclear from the record whether this search warrant was the subject of a motion to suppress in the unrelated case, it is not relevant to the issues in this appeal.

[2] In *Carpenter*, the United States Supreme Court held that police must obtain a warrant supported by probable cause before acquiring cell site location information. *Carpenter*, 585 U.S. 296, 305 (2018).

[3] The trial court noted that the State introduced the November 2018 search warrant during the May 1, 2019 suppression hearing. However, neither the transcript nor the exhibits for the May 1, 2019 hearing appear in the record.

autopsy, an eyewitness who identified Defendant as the shooter, and the call log and cell site location data obtained through the January 2018 court order.

Defendant filed a "Third Motion to Exclude Evidence of Same Search," and later a fourth motion to suppress incorporating the third motion,[4] in which he argued that the June 12, 2019, and April 9, 2020 search warrants attempted to establish probable cause by relying on evidence obtained through the previously suppressed November 2018 search warrant. The trial court granted Defendant's motion to suppress, finding that the June 12, 2019 affidavit for search warrant failed to establish a nexus between the cell phone and the shooting. The trial court noted that the April 9, 2020 affidavit for search warrant included more information, but that the additional information could not be considered by the court because it was obtained through the previously invalidated November 2018 search warrant. The trial court again suppressed the cell site location data, finding that the April 9, 2020 search warrant still failed to establish a nexus between the cell phone and the shooting.

*Trial*

Shortly before 6:00 p.m. on February 12, 2017, MNPD officers responded to a shooting at the Andrew Jackson Apartments. When MNPD Officer Zachary Ronan arrived on scene, he located the victim lying face down on the sidewalk. Officer Ronan knew the victim had been shot once, but "flipped him over" to search for additional wounds and any weapons. Officer Ronan did not find any weapons on the victim. Shortly thereafter, the victim was transported to Vanderbilt Medical Center, where he was later pronounced dead. MNPD officers secured the scene and were unsuccessful in their attempts to locate any witnesses that night.

MNPD crime scene investigator Lynette Mace created a crime scene diagram. The crime scene diagram showed where the victim was found, where five 9 mm shell casings were found, and where vehicles were parked along the side of the road. The shell casings were found on the road outside of an alley, a short distance from where the victim was found, which led to the Boys & Girls Club. Ms. Mace measured from each of the shell casings to various reference points, such as the edge of sidewalks. The crime scene diagram also marked three places where officers located "biological matter" between the alley and where the victim was found. On cross-examination, Ms. Mace explained that it was not unusual for shell casings to be scattered. She agreed that the alley was sloped and that the slope would have a "minimal" impact on the location of the shell casings.

---

[4] Defendant filed his second motion to suppress in the pending unrelated case. He then filed a third and fourth motion to suppress the evidence obtained pursuant to the June 12, 2019, and April 9, 2020 search warrants. Because the fourth motion to suppress incorporated the third motion to suppress, the trial court issued one order addressing both motions.

In February 2017, Jasmine Corley lived in the Andrew Jackson Apartments with her three children. Her apartment was down the street from the alley that led to the Boys & Girls Club. On February 12, Ms. Corley and Olivia Davis had taken their children with them to the store. When they returned, Ms. Davis parked her vehicle in front of Ms. Corley's apartment with the front of the vehicle facing the direction of the alley, and the passenger side of the vehicle next to the sidewalk. Ms. Corley could see the alley as she removed a car seat from the passenger side of the vehicle. A man unknown to Ms. Corley, later identified as the victim, walked past Ms. Corley toward the alley. When the victim got to the alley, Ms. Corley saw him speak to a "guy in a black hoodie and black hat" and then the man in the black hoodie shot the victim. She did not see the victim shoot a firearm. The victim then ran toward Ms. Corley before he "crossed the street and fell" and told her to call 911. Ms. Corley's 911 call was played for the jury. Surveillance footage that showed Ms. Davis's car and the street, but not the alley, was also played for the jury. In the video, Ms. Corley can be seen on the phone while other unidentified people move toward the area where the victim was later found. Ms. Corley explained that she was on the phone with 911 in the video. Ms. Corley affirmed that neither the victim nor Defendant appear on the surveillance footage at any point.

Ms. Corley did not want to be involved in the investigation but the police "just kept calling." The first time that she spoke with police, Ms. Corley denied witnessing the shooting. She affirmed that she was unwilling to testify and had been compelled to appear in court. Ms. Corley knew Defendant because he was frequently around the Andrew Jackson Apartments, and they were distantly related. She agreed that her connections to Defendant contributed to her unwillingness to be involved in the investigation. Ms. Corley eventually met with MNPD Detective Melody Saxon and told her that Defendant had committed the shooting. Ms. Corley identified Defendant in a photographic lineup, which was admitted at trial, and she identified Defendant in court as the same man. On the photographic lineup form, Ms. Corley wrote that she

> saw [Defendant] pull the gun and shoot it. [The victim] walked up to [Defendant] to do a hand to hand exchange, I saw [Defendant] pull [a] gun from [his] waistband and point the gun. [Defendant] had on a hoodie maybe black and black stocking cap on. He shot the gun, fire came out, he shot three times and took off running. The victim ran by and asked me to call [the] [p]olice.

After the shooting, Ms. Corley asked for Detective Saxon's assistance moving out of the Andrew Jackson Apartments because Ms. Corley had concerns about her and her family's safety. Ms. Corley moved but was later "kicked out of" the new apartment; she believed this was because of her involvement in this case.

On cross-examination, Ms. Corley admitted that in the 911 call she did not mention that she saw the shooting or identify Defendant, but she maintained that she had always been "[s]omewhat" truthful in her prior statements. Ms. Corley agreed that she first identified Defendant as the shooter in December 2017. She stated that Defendant was the only person in the lineup that she knew and agreed that she felt a "little" pressure to make an identification. Ms. Corley had smoked marijuana prior to the shooting and agreed that she had a "harder time understanding what's going on around [her] when [she's] high." Ultimately, Ms. Corley agreed that she was not sure what she had seen that day. On redirect examination, Ms. Corley stated that Detective Saxon did not tell her to identify Defendant.

Olivia Davis testified that she was in the driver's seat of her car but turned facing the backseat where Ms. Corley was trying to remove a car seat, when she heard gunshots. She did not see who fired the shots, but saw the victim run down the street and heard him say to call the police. Ms. Davis was not voluntarily involved in the investigation of this case and denied telling Detective Saxon that she was afraid to be involved.

Detective Saxon was notified by MNPD Sergeant Brad Johns that there had been a shooting at the Andrew Jackson Apartments. The first officer arrived at 5:46 p.m., and Detective Saxon arrived about an hour later. As she canvassed the area on the night of the shooting, Detective Saxon found witnesses who heard gun shots, but could not find witnesses who saw anything; she explained that this was typical in her experience. She collected surveillance footage from one camera that showed Ms. Corley and Ms. Davis at Ms. Davis's car, but she was unable to recover any other surveillance footage. She also reviewed four 911 calls and identified three of the callers during her investigation. Two of the 911 callers had only heard shots, and the third was Ms. Corley. During the investigation, an anonymous caller identified Defendant as the person responsible for the shooting; Detective Saxon stated this was not the only time that Defendant's name had been tied to the investigation.

Detective Saxon denied calling Ms. Corley multiple times or forcing her to testify. She met with Ms. Corley at a "neutral site" of Ms. Corley's choosing to conduct the photographic lineup. Detective Saxon denied mentioning that Defendant was a suspect. Ms. Corley identified Defendant "very quickly" and was "very confident" in her identification. Detective Saxon identified Defendant in court as the man whom Ms. Corley identified in the photographic lineup.

On cross-examination, Detective Saxon was questioned about the evidence connecting Defendant to the shooting:

> [Defense Counsel]: . . . Are there any fingerprints that may suggest that [Defendant] committed this offense?

[Detective Saxon]: No, sir. There's not.

[Defense Counsel]: Is there any DNA evidence that might . . . connect [Defendant] to this incident?

[Detective Saxon]: No, sir.

[Defense Counsel]: Is there any physical evidence that connects him to this case?

[Detective Saxon]: No, sir.

Dr. Miguel Laboy, an expert in forensic pathology, performed the victim's autopsy and determined the victim's cause of death to be multiple gunshot wounds, and the manner of death to be homicide. The victim had suffered gunshot wounds to his left arm, back, right buttock, and a graze wound to his left hand. Dr. Laboy agreed that the gunshot wound to the victim's right buttock was inflicted while the victim's back was to the assailant and that the wound to the victim's back "hit the back and went sideways back to front." Dr. Laboy was unable to determine the order of the injuries but opined that the wound to the victim's back, which perforated the victim's left kidney and aorta, and penetrated his liver, would have been a lethal injury. On cross-examination, Dr. Laboy agreed that he was confident that the victim had been struck by "[a]t least three" bullets based on the injuries.

MNPD Detective William Mathis reviewed Defendant's Instagram page and found three videos posted after the shooting that appeared to have been taken in the Andrew Jackson Apartments. He stated that he could not determine when the videos were taken but knew that they had been uploaded after the date of the shooting.

After the jury was excused for the night, the State informed the trial court and defense counsel, via email, that it believed Defendant had opened the door to the previously excluded cell site location data by asking Detective Saxon whether there was any physical evidence that linked Defendant to the scene. The next morning, out of the presence of the jury, the trial court heard arguments from the parties on this issue. Defendant agreed that the cell phone was physical evidence but asserted that people "using common language and not using language of litigation, would [not] think that physical evidence consists of whatever a [cell phone] tower may be projecting from or to a phone." The trial court disagreed, ruling that the door had been opened, explaining: "you're saying that there was no physical evidence, or however you phrased it, that connects him to this case. That was your records. The physical evidence connecting him to this case." The State then recalled Detective Saxon, who testified that in late September 2017, after coming into contact with

Defendant on another case, she obtained cell phone records from a phone Defendant had in his possession, and she had sent the phone records to Detective High for analysis.

MNPD Detective Joseph Chad High testified as an expert in "historical call detail record analysis." He had performed an extraction on the cell phone obtained from Defendant in late September 2017, which revealed that an outgoing call at 5:50 p.m., approximately four minutes after the shooting, utilized the tower that covered the Andrew Jackson Apartments. He explained that this was "consistent with that phone being in that general area" but could not specifically say where the phone was at the time of the call. On cross-examination, Detective High affirmed that there was no other evidence on the phone that placed Defendant near the scene of the shooting. He agreed that cell phones do not always use the closest cell tower and that the call could have been placed miles away from the Andrew Jackson Apartments. On redirect examination, Detective High explained that there were two other calls placed from the cell phone between 5:30 and 6:00 p.m. that were also consistent with the phone's being near the Andrew Jackson Apartments.

The State then rested its case and Defendant moved for a judgment of acquittal, which was denied. Defendant elected not to testify but called Chanel Arnold-Murray, a licensed private investigator. Ms. Arnold-Murray went to the scene prior to trial and based on the measurements of the crime scene diagram, Ms. Arnold-Murray measured the distance between each of the shell casings and Ms. Davis's vehicle which Ms. Corley had just exited when she witnessed the shooting. She determined the casings to be located between approximately 86 and 130 feet from the vehicle. On cross-examination, Ms. Arnold-Murray agreed that her measurements were not exact, but were estimations based on where the crime scene diagram showed each shell casing was located. Defendant then rested his case.

Based on the above evidence, the jury convicted Defendant of premeditated first degree murder. The trial court then imposed a sentence of life imprisonment. Defendant's timely appeal is now before this court.

**Analysis**

I. Admission of Cell Site Location Data

Defendant asserts that the trial court abused its discretion when it determined that he had "opened the door" to the admission of the cell site location data by asking Detective Saxon if there was any physical evidence that placed Defendant at the scene, and that the erroneous admission of the evidence was not harmless. The State argues that the trial court properly found that Defendant opened the door, and alternatively, that any error was harmless beyond a reasonable doubt. We agree with the State that the trial court did not

- 7 -

abuse its discretion in finding that Defendant opened the door to admission of the cell site location data.

The doctrine of opening the door is an equitable principle intended to serve fairness and truth-seeking. *State v. Erwin*, No. E2021-01232-CCA-R3-CD, 2022 WL 3355024, at *4 (Tenn. Crim. App. Aug. 15, 2022), *no perm. app. filed*. It applies when a party "expands the realm of relevance" by introducing evidence that creates a misleading advantage, thus allowing the opposing party to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012); *see State v. Gunn*, No.W2016-00338-CCA-R3-CD, 2017 WL 4861664, at *10-12 (Tenn. Crim. App. Oct. 26, 2017) (noting that the defendant had opened the door to testimony regarding a previously suppressed search warrant by questioning the detective about his prior involvement with the defendant). When the door is opened, the remedy sought should be "both relevant and proportional" and the otherwise inadmissible evidence must be "limited to that necessary to correct a misleading advantage created by the evidence that opened the door." *State v. Griffith*, No. M2020-00521-CCA-R3-CD, 2021 WL 2834622, at *6 (Tenn. Crim. App. July 8, 2021) (citing *State v. Vance*, 696 S.W.3d 299, 250-51 (Tenn. 2020)), *perm. app. denied* (Tenn. Jan. 14, 2022). The party seeking to introduce evidence through the "opened door" is not required to object before proceeding to request relief. *State v. Cheatham*, No. E2021-01241-CCA-R3-CD, 2023 WL 3025199, at *16 (Tenn. Crim. App. Jan. 6, 2023), *perm. app. denied* (Tenn. June 13, 2023).

This court reviews a trial court's application of the opening-the-door doctrine for an abuse of discretion. *State v. Clayton*, 535 S.W.3d 829, 861 (Tenn. 2017). A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Johnson*, 401 S.W.3d 1, 21 (Tenn. 2013) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)). If this court determines that the trial court improperly applied the doctrine, we must determine whether the error was harmless. *Gomez*, 367 S.W.3d at 249. The erroneous admission of cell phone records obtained via a constitutionally inadequate warrant are non-structural constitutional errors. *State v. McLawhorn*, 636 S.W.3d 210, 245 (Tenn. 2020). "Non-constitutional errors are harmful and demand reversal when 'considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Gomez*, 367 S.W.3d at 249 (quoting Tenn. R. App. P. 36(b)).

Here, the trial court excluded the cell site location data finding that the search warrants lacked probable cause. *See State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017). However, during trial, based on defense counsel's question of whether there was any

"physical evidence" connecting Defendant to the case, the trial court ruled that Defendant opened the door, and allowed the admission of the cell site location data.

Defendant claims that the crux of the issue is whether the cell site location data, constitutes "physical evidence," and argues that prior panels of this court have "clearly demarcated between 'physical evidence' and data collected from an electronic device" based on the recitation of facts in opinions. However, Defendant's argument is unpersuasive as all the cases he cites simply discuss various types of evidence without any holding that there is a distinct difference between physical evidence and data from electronic devices. *See State v. Hinton*, No. M2020-00812-CCA-R3-CD, 2021 WL 3076959, at *4 (Tenn. Crim. App. Jul. 21, 2021) (noting, in the fact section of the opinion, that law enforcement "analyzed data from a 'black box' in the victim's Toyota, as well as physical evidence at the crash scene"), *perm. app. denied* (Tenn. Nov. 19, 2021); *State v. Jefferson*, No. W2020-00578-CCA-R3-CD, 2021 WL 2556654, at *1 (Tenn. Crim. App. June 22, 2021) (summarizing, in the fact section of the opinion, that the state presented among other evidence "DNA and physical evidence . . . [and] GPS data"), *no perm. app. filed*; *State v. Fletcher*, No. M2018-01293-CCA-R3-CD, 2020 WL 995795, at *11 (Tenn. Crim. App. Mar. 2, 2020) (summarizing, in the fact section of the opinion, that law enforcement "agreed there was no physical evidence tying the defendant to the murder" after discussing contact information obtained from the defendant's cell phone). *But see State v. McKinney*, 669 S.W.3d 753, 767 (Tenn. 2023) ("In other words, non-testimonial physical evidence, such as [d]efendant's cell phone data in this case, is only excludable when the suspect's unwarned statements are deemed involuntary.").

Neither this court nor our supreme court has held, or considered, whether cell site location data, is, or is not, considered physical evidence. Accordingly, in making its ruling, the trial court did not apply an incorrect legal standard. The trial court concluded, based on the circumstances, that Defendant's eliciting from Detective Saxon that there was no physical evidence connecting Defendant to the scene created a misleading impression for the jury. Detective High's testimony was directly relevant and proportional to correct the misleading impression. *See State v. Clausell*, No. E2022-01662-CCA-R3-CD, 2024 WL 659956, at *24 (Tenn. Crim. App. Feb. 16, 2024) (quoting *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019)) ("[I]f the reviewing court determines that 'reasonable minds can disagree with the propriety of the decision,' the decision should be affirmed."), *perm. app. denied* (Tenn. Aug. 13, 2024). We cannot conclude that the trial court abused its discretion in finding that Defendant opened the door to the admission of the cell site location data.

Regardless, even if this court were to conclude that the trial court erred in finding that Defendant's question about physical evidence opened the door to the admission of the cell site location data, any error was harmless because the evidence did not "more probably than not affect[] the judgment[.]" Tenn. R. App. P. 36(b). Detective High was clear that

although the three calls were consistent with Defendant's being at or near the Andrew Jackson Apartments between 5:30 p.m. and 6:00 p.m., he was equally clear that the cell phone "could have been miles away" because cell phones do not always use the closest tower. While the cell site location data was minimally corroborative of Ms. Corley's testimony, it is unlikely based on all of the evidence in the case, including an eyewitness, that the exclusion of the evidence would have led to Defendant's acquittal. As Defendant notes, Ms. Corley was clear that she did not want to testify, and she made contradictory statements. However, by returning a guilty verdict, the jury accredited Ms. Corley's testimony that she witnessed Defendant shoot the victim. *See State v. Murray*, No. M2021-00688-CCA-R3-CD, 2022 WL 17336522, at *5 (Tenn. Crim. App. Nov. 30, 2022) ("We must decline the defendant's invitation to reevaluate the credibility of the witnesses or to revisit inconsistencies in the testimony because both fall solely within the purview of the jury as the trier of fact."), *perm. app. denied* (Tenn. Mar. 8, 2023). Defendant is not entitled to relief.

## II. Sufficiency of the Evidence

Defendant asserts that there was inadequate evidence to support a finding of premeditated intent because there was no evidence presented about the circumstances of the offense other than the testimony of Ms. Corley. The State argues that the circumstances surrounding the offense provided sufficient evidence upon which a reasonable jury could find that Defendant acted with intent and premeditation. We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quotations omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quotations omitted) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quotations omitted) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*,

245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

First degree murder is the "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Premeditation requires that an act is done:

> after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(e). The existence of premeditation is "a question of fact to be determined by the jury from all of the circumstances surrounding the killing." *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003). The jury "cannot speculate what was in the killer's mind," *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007), but it may consider the following factors to infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation on the victim's part; (8) a defendant's failure to render aid to a victim; (9) destruction of evidence of the killing; (10) evidence of motive; (11) the use of multiple weapons or the infliction of multiple wounds; and (12) evidence that the victim was attempting to escape when killed. *State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021); *see McKinney*, 669 S.W.3d at 773 (citing *State v. Clayton*, 535 S.W.3d 820, 845 (Tenn. 2017)). As there is often no direct evidence of a defendant's state of mind, "premeditation may be proved by circumstantial evidence[.]" *Davidson*, 121 S.W.3d at 614-15.

When viewed in the light most favorable to the State, the evidence showed that the victim walked past Ms. Corley toward the alley, where he then had a "hand-to-hand" exchange with a man wearing a black hoodie and hat. Ms. Corley then heard gunshots, and the victim ran toward her before asking her to call 911 and collapsing on the ground. Officers did not find any weapons on the victim, and there was no evidence suggesting that the victim had provoked Defendant. *See McKinney*, 669 S.W.3d at 773. Further, Ms. Corley testified that Defendant fled the scene after the shooting, so clearly, he did not attempt to render aid to the victim. According to Dr. Laboy, the victim suffered four gunshot wounds, from "at least" three bullets and at least one of the wounds was inflicted while the victim's back was to Defendant. Based on this evidence, the jury could reasonably infer that the victim was attempting to flee. Although Ms. Corley did not identify Defendant as the shooter until approximately ten months after the shooting, she explained that she had not identified Defendant sooner because she feared retaliation. The jury heard from MNPD officers that delayed identity was not uncommon in their prior experiences with witnesses who lived in the Andrew Jackson Apartments and surrounding areas. Finally, the cell site location data placed Defendant's phone in the area at the time of the shooting.

Based on this proof, in the light most favorable to the State, there was sufficient evidence to support the jury's finding of premeditation. *See Reynolds*, 635 S.W.3d at 919 ("Although perhaps the proof supporting the jury's finding of premeditation in this case may not be overwhelming, that is not required by the applicable legal standards."). Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 12 -